S08G1833. CONDRA et al. v. ATLANTA ORTHOPAEDIC GROUP, P.C. et al.

(681 SE2d 152)

HUNSTEIN, Presiding Justice.

We granted certiorari to the Court of Appeals in this medical malpractice action to consider (1) whether plaintiffs were properly prohibited from inquiring at trial into the personal practices of defendants' expert witnesses with respect to the medical treatment at issue in the case; and (2) whether the so-called "hindsight" jury instruction was appropriately given under the circumstances presented. The Court of Appeals answered both questions in the affirmative. *Condra v. Atlanta Orthopaedic Group, P.C.*, 292 Ga. App. 276 (664 SE2d 281) (2008). We now reverse on both issues.

In May 1998, Daphyne Condra sought treatment for back, neck, and arm pain from orthopedist James Chappuis, M.D., who prescribed a 30-day regimen of the anti-convulsive drug Tegretol, followed by another 30-day regimen when her condition had not improved. Shortly after Condra began her second prescription, she began experiencing leg cramping and shortness of breath, leading ultimately to her hospitalization, where she was diagnosed with aplastic anemia, a rare and serious bone marrow disease. Condra and her husband sued Dr. Chappuis and his orthopedic group for medical malpractice, asserting that Tegretol had been an inappropriate drug choice for Condra and that Dr. Chappuis had been negligent in failing to conduct blood count monitoring during Condra's Tegretol therapy to detect any potential adverse reactions.

At trial, Condra's experts and treating hematologists opined that the Tegretol had caused Condra's aplastic anemia and that develop-

ment of the disease could have been avoided had Dr. Chappuis conducted blood count monitoring during Condra's treatment. Specifically, they testified that conducting an initial "baseline" blood count prior to beginning the medication, followed by subsequent blood tests at regular intervals thereafter, may have alerted her care providers to a drop in white blood cells and in turn led to a discontinuation of the Tegretol and reversal of the development of the aplastic anemia. Condra's expert neurosurgeon further testified that the failure to conduct blood conduct monitoring was a breach of the standard of care.

Defense experts Richard Franco, M.D. and Peter Staats, M.D. acknowledged at trial that much of the medical literature recommends blood count monitoring during Tegretol therapy. They testified further, however, that such monitoring was, though a "reasonable" course of action, not "mandatory or essential"; that failure to conduct such monitoring did not constitute a breach of the standard of care; and that such monitoring, even if it had been conducted, would have been unlikely to detect development of the aplastic anemia at a point at which its development could have been arrested. During pretrial discovery, however, Dr. Franco had deposed that it was his usual practice to conduct blood count monitoring when he prescribed Tegretol.[1] Before trial, the defense moved in limine to prevent plaintiffs from inquiring at trial into these experts' personal practices, and the trial court granted the motion.

Also at trial, the court, over plaintiffs' objection, gave the so-called "hindsight" jury instruction:

> I charge you that in the medical malpractice action the defendant cannot be found negligent on the basis of an assessment of a patient's condition that only later in hindsight proves to be incorrect as long as the initial assessment was made in compliance with reasonable standards of care. In other words, the concept of negligence does not include hindsight. Negligence consists of not foreseeing and guarding against that which is probable and likely to happen, not against that which is only remotely and slightly possible.

See Suggested Pattern Jury Instructions, Vol. I: Civil Cases (5th ed.), § 62.311. Despite plaintiffs' objections that the charge was inapplicable to their case and that the last sentence thereof is an incorrect statement of the law, the trial court gave this instruction both during

---

[1] Though the Condras assert that Dr. Staats likewise testified at his deposition to his usual practice of conducting blood count monitoring when prescribing Tegretol, this assertion is unsupported given the omission of Dr. Staats' deposition transcript from the record.

the initial jury charge and during a recharge the following day. The jury ultimately returned a defense verdict, and, on appeal, the Court of Appeals affirmed. *Condra*, supra, 292 Ga. App. at 281.

1. Regarding the personal practices testimony of defendants' experts, the Court of Appeals upheld the trial court's decision to exclude such testimony by relying on the controlling authority of *Johnson v. Riverdale Anesthesia Assocs.*, 275 Ga. 240 (563 SE2d 431) (2002). In *Johnson*, a majority of this Court held that testimony regarding a medical expert's personal practices was inadmissible both as substantive evidence regarding the applicable standard of care and as impeachment evidence. Id. at 241-242 (1), (2). The Court reasoned that, because the applicable standard of care in medical malpractice actions refers to those practices employed by the medical profession generally rather than those employed by any individual provider, evidence as to an expert's personal practices is irrelevant in establishing the standard of care. Id. at 241-242 (1). Because a witness may not be impeached with irrelevant facts or evidence, the Court held further that such evidence was not admissible for purposes of impeachment. Id. at 242 (2).

Having considered the matter anew in light of recent statutory developments and the practice of other jurisdictions, we have determined that *Johnson* is no longer viable. Accordingly, we now overrule *Johnson* and hold that evidence regarding an expert witness' personal practices, unless subject to exclusion on other evidentiary grounds, is admissible both as substantive evidence and to impeach the expert's opinion regarding the applicable standard of care.

Our decision in this regard is predicated primarily on the fact that, subsequent to the *Johnson* decision, our Legislature enacted as part of its Tort Reform Act, Ga. L. 2005, p. 1, § 7, a new statute governing admissibility of expert testimony in civil actions. OCGA § 24-9-67.1. This statute places particular emphasis on a proffered medical expert's professional experience and practice in assessing his or her qualification to serve as an expert witness:

> . . . [I]n professional malpractice actions, the opinions of an expert, who is otherwise qualified as to the acceptable standard of conduct of the professional whose conduct is at issue, shall be admissible only if, at the time the act or omission is alleged to have occurred, such expert: . . . had *actual professional knowledge and experience* in the area of practice or specialty in which the opinion is to be given as the result of having been *regularly engaged in:* . . . *[t]he active practice of such area of specialty of his or her profession for at least three of the last five years, with sufficient frequency to establish an appropriate level of*

*knowledge*, as determined by the judge, in performing the procedure, diagnosing the condition, or rendering the treatment which is alleged to have been performed or rendered negligently . . . .

(Emphasis supplied.) OCGA § 24-9-67.1 (c) (2) (A). Thus, there can be no dispute as to the relevance, post-Tort Reform Act, of an expert's personal experience and practice to the threshold inquiry into the expert's qualifications.

Given the prominence of the expert's personal practice in this threshold inquiry, it would defy logic to find such experience categorically irrelevant in assessing the credibility of the expert's testimony. "[T]he jury is entitled to fully evaluate the credibility of the testifying expert, and the fact that an expert testifies that the standard of care does not require what that expert personally does in a similar situation may be a critical piece of information for the jury's consideration." *Smethers v. Campion*, 108 P3d 946, 956 (Ariz. Ct. App. 2005).

> The relevance and importance of a medical expert's personal choice of a course of treatment is highly probative of the credibility of the expert's opinion concerning the standard of care. A jury is free to disregard the expert's opinion entirely and find that the standard of care is reflected by the course of treatment the expert would have chosen, a highly probable scenario if other evidence admitted in the case supports this proposition. . . . Permitting the expert to be cross-examined on a personal choice regarding course of treatment and why it would be different than the defendant-doctor allows a full examination of the expert's opinion on standard of care and the basis therefor.

(Footnotes omitted.) Overby et al., Trial Practice and Procedure, 51 Mercer L. Rev. 487, 501-502 (Fall 1999). Accord *Bergman v. Kelsey*, 873 NE2d 486, 507 (Ill. App. Ct. 2007) ("a medical expert's personal practices may well be relevant to that expert's credibility, particularly when those practices do not entirely conform to the expert's opinion as to the standard of care").

We find implicit support for this conclusion in the Legislature's exhortation in the expert testimony statute that

> the courts of this state . . . draw from the opinions of the United States Supreme Court in Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U. S. 579 [(113 SC 2786, 125 LE2d 469)] (1993), [and its progeny].

OCGA § 24-9-67.1 (f). See also *Mason v. Home Depot USA, Inc.*, 283 Ga. 271 (3) (658 SE2d 603) (2008) (affirming Legislature's ability to suggest that courts consider foreign authority). Under the *Daubert* line of cases, the trial judge acts as the gatekeeper in determining the admissibility of expert opinion, and the jury is charged with the responsibility of evaluating the credibility of the expert's testimony. *Daubert*, 509 U. S. at 589 (II) (B), 595 (III). Such evaluation is made possible through, among other things, "[v]igorous cross-examination." Id. at 596 (III).

> The right of . . . cross examination . . . is a substantial right, the preservation of which is essential to the proper administration of justice, and extends to all matters within the knowledge of the witness, the disclosure of which is material to the controversy.

*News Publishing Co. v. Butler*, 95 Ga. 559, 559 (1) (22 SE 282) (1895). Neither the jury's ability to perform its role as arbiter of the expert's credibility, nor the party's right to a "thorough and sifting cross-examination," OCGA § 24-9-64, is well served by a prohibition on cross-examination of the opposing party's expert regarding personal practices that differ from the standard of care as asserted by that expert.

Also important in our decision to shift course on this issue is the growing body of case law from other jurisdictions supportive of the admissibility of expert personal practices testimony, at least for some purposes. See, e.g., *Swink v. Weintraub*, 672 SE2d 53 (III) (N.C. Ct. App. 2009) (affirming admission of personal practices testimony); *Bergman*, supra, 873 NE2d at 507 (II) (B) (2) (d) (affirming admission of personal practices testimony for impeachment purposes); *Smethers*, supra, 108 P3d at 956 (reversing exclusion of personal practices testimony); *Gallina v. Watson*, 821 NE2d 326 (II) (A) (Ill. App. Ct. 2004) (reversing exclusion of personal practices testimony); *Wallbank v. Rothenberg*, 74 P3d 413 (I) (Colo. Ct. App. 2003) (affirming admission of personal practices testimony). See also *Hartel v. Pruett*, 998 So2d 979 (I) (E) (Miss. 2008) (no abuse of discretion in permitting expert personal practices testimony); *Walker v. Sharma*, 655 SE2d 775, 782-783 (W. Va. 2007) (where physician qualified as expert, personal practices as to procedures on which expert opinion offered relevant for purposes of assessing credibility). Though not all jurisdictions have followed this trend, see, e.g., *Vititoe v. Lester E. Cox Med. Centers*, 27 SW3d 812 (III) (Mo. Ct. App. 2000) (affirming exclusion of personal practices testimony); *Carbonnell v. Bluhm*, 318 NW2d 659 (III) (Mich. Ct. App. 1982) (same), admissibility of personal practices testimony appears now to

be the prevailing view.

Finally, though defendants assert that allowing expert personal practices testimony is likely to confuse the jury by conflating the standard of care with an expert's personal protocols, we find that such potential for prejudice does not as a general rule outweigh the usefulness of such information in evaluating an expert's credibility. Moreover, any potential confusion created by the admission of such evidence may be remedied through the use of careful jury instructions. Such instructions should, for example, clearly define the legal meaning of standard of care; enunciate the principle that a mere difference in views between physicians does not by itself prove malpractice, see, e.g., *Brannen v. Prince*, 204 Ga. App. 866 (2) (421 SE2d 76) (1992), overruled on other grounds by *Gillis v. City of Waycross*, 247 Ga. App. 119 (543 SE2d 423) (2000); and clarify concepts such as burden of proof and credibility of witnesses. In addition, the party whose expert has been cross-examined will have the ability to elicit explanations for why the expert's practices differ from what that expert attested to as the standard of care. Armed with complete information regarding the expert's opinion and personal practices, jurors can make intelligent judgments about the reliability of the expert's testimony.

In this case, the jury was precluded from achieving such an informed judgment. Lacking the benefit of knowledge that defendants' own experts routinely practiced differently from the standard of care to which they had testified, the jury was compelled to make a determination as to the standard of care based on incomplete and potentially misleading information. Under these circumstances, we cannot find the erroneous exclusion of personal practices testimony to have been harmless. The curtailment of plaintiffs' substantial right to a thorough and sifting cross-examination of the defense's experts clearly warrants reversal. See *Lightfoot v. Applewhite*, 212 Ga. 136 (3) (91 SE2d 37) (1956).

2. On retrial, the use of the hindsight instruction will be limited as set forth in our opinion, issued contemporaneously herewith, in *Smith v. Finch*, 285 Ga. 709 (681 SE2d 147) (2009).

*Judgment reversed. All the Justices concur.*

DECIDED JUNE 29, 2009.

*Pope & Howard, Geoffrey E. Pope, Ralph I. Knowles, Jr.*, for appellants.

*Huff, Powell & Bailey, Daniel J. Huff, Camille N. Jarman, Peters & Monyak, Robert P. Monyak, Jeffrey S. Bazinet*, for appellees.

*James D. Summerville*, amicus curiae.